## AMERICAN WEEKLY, Inc., v. HOUSTON PRINTING CORPORATION.

### No. 10263.

Circuit Court of Appeals, Fifth Circuit.

March 17, 1943.

As Amended on Denial of Rehearing
May 26, 1943.

W. L. Matthews, of San Antonio, Tex., and John P. Bullington, of Houston, Tex., for appellant.

Frank J. Knapp, George W. Rice, and Jack Binion, all of Houston, Tex., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

American Weekly, Inc., (called herein American), publishes a weekly magazine in Chicago which it furnishes to many newspapers to accompany their Sunday editions as a Sunday supplement. On Aug. 28, 1937, it entered into a written contract with Houston Printing Corporation (called herein Houston) which publishes the Houston Post, to furnish each week as ordered copies of the Weekly's magazine supplement "at a price of $13.05 per thousand copies of twenty-four pages each, subject to modifications as hereinafter set forth, f. o. b. the printing plant at Chicago." The contract was cancellable on written notice to take effect on any Jan. 1, but not earlier than Jan. 1, 1940. Deliveries began Jan. 1, 1938. In April following Houston expressed dissatisfaction at the falling off in advertising matter in the supplement, in the income from which Houston shared under the contract. Early in 1939, Houston claimed that the contract provided for a definite ratio of advertising matter to other matter, which had not been maintained, and sought to cancel the contract. American denied this construction of the contract, and asserted that its provisions were being fulfilled. Controversy continued, and Houston refused to pay monthly, as agreed, for the supplements sent after April, 1939, and American ceased to remit Houston's part of the advertising income after May, 1939. Houston, however, continued to order weekly the number of supplements it required, which were sent, and distributed; the disputants agreeing that without prejudice to their contentions the business should be carried on till Dec. 31, 1940. Thereafter, unable to reach a settlement, American sued Houston for $54,942 which it claimed. Houston denied owing anything, and pleaded that by reason of the deficiency in advertising matter American had wholly breached the contract, and could not recover on it; that for the reason stated American had partially breached the contract; that the contract is ambiguous as to the amount of advertising, but at the time of its execution it was distinctly understood that there would be 32% paid advertising, and that this was the effect of the provision in Par. 8(a) of the contract; that the contract was unilateral and not binding; and by way of counterclaim, that by American's failure to maintain the advertising ratio, Houston was damaged in having to pay an additional cost of printing the other matter, and an increased cost of freight so that Houston had overpaid American $15,123 prior to April, 1939, and had been damaged $34,515 since. The judge tried the case without a jury. He found that there were no false statements to induce the contract, and no mutual mistake in its wording; that it was unambiguous, so that the parol evidence offered was not admissible or needed to explain it; that it meant that paid advertising should balance other matter in the ratio of approximately fifty-four columns of the former to 114 columns of the latter, or 32% to 68% of the whole paper, and in each instance where the ratio was not maintained there was a violation of the contract by American. He concluded that each issue which did not maintain that ratio should not be paid for by Houston, nor should Houston share in its advertising income, but Houston should recover its outlay for freight thereon. Issues which did maintain the ratio should be settled for under the contract. He held the contract not unilateral, and not cancelled. The result was a recovery of $60,710 by Houston against American. American appeals.

It is plain the contract was not cancelled or rescinded, but was by mutual consent continued to Dec. 31, 1940; so there is no need to enquire whether Houston had good ground to end it. Nor need we enquire whether it was unilateral. We think Houston was by its terms probably bound to order its needs from week to week, but whether so bound or not, it did order, receive and distribute the supplements under the contract, reserving its contention as to the meaning of it. Settlement for the supplements according to the contract cannot be avoided even if the contract was originally unilateral.

The written contract was before its signing carefully gone over and discussed, paragraph by paragraph, by the contracting parties. Nothing was omitted by accident, mistake or fraud. But we do not find in it any provision for an exact ratio between paid advertising and other matter which would render an issue of the supplement, for lack thereof, not the thing contracted for. American was not making a supplement for

Houston according to exact specifications, but was furnishing issues of its weekly paper as published. It could control the amount of reading matter it would contain, but the amount of paid advertising necessarily was limited by what could be gotten, and the evidence is that this not only depends on business conditions, but is seasonal, at times hardly any being procurable. Houston knew this as well as American did. The analysis of the issues sent Houston shows a wide variation. In 1938 the first issue in May had 80 columns of advertising, but the last only 18½ columns. Thereafter it averaged around 50 columns but in November, descended into the twenties. The second issue in December carried 68½ columns, the third 16, and the fourth only one-tenth of a column. The advertising in the year previous to the making of the contract was examined by the contracting parties and showed similar variations, though the average was considerably higher. We think experienced publishers would be unlikely to make an iron-clad contract as to the advertising to be included in each issue, and examining the contract we think they did not. The contract provides that Houston shall share in the advertising income actually collected each month. American's share is much larger, so that American's self interest could be relied on for due effort to secure advertising. We have no dispute about the advertising income and its division. The dispute is whether there is a contract for a ratio between advertising and other matter which was not maintained, and with what consequences.

■ The provisions as to the make-up of the supplement and the price to be paid for it are copied in the margin.[1] A price of $13.05 per thousand is first named for a supplement of 24 pages (168 columns) subject to modifications to be stated. It is then agreed in Par. 3 that the supplement is to consist of editorial matter (meaning all that is not advertising) and advertising, "based on a minimum editorial content of 84 columns per issue." That much "reading matter" at least is to be furnished for Houston's subscribers. No amount of advertising is here stipulated for. There follows in Pars. 5, 6 and 7 many provisions as to advertising rates and zones, and the sharing of the advertising income, but they throw no light on the amount of advertising space. Par. 8 returns to *the price* of the supplement, which is to be modified each week according to the size of the paper, increased or decreased by two pages, and the cost of labor, paper and ink. The opening sentence and the first of the five things named as the price basis is the important matter here: "Par. 8. It is agreed between the parties that the price of the magazine supplements to be furnished by

[1] "1. The Weekly agrees to produce and ship each week as many copies of the Weekly's magazine supplements as are ordered by the newspaper at a price of Thirteen and 5/100 Dollars ($13.05) per thousand copies of twenty-four (24) pages each, subject to modifications as hereinafter set forth, f. o. b. the printing plant at Chicago.

\* \* \* \* \*

"3. The magazine supplement herein designated is to consist of editorial matter and advertising based on a minimum editorial content of eighty-four (84) columns per issue and such editorial content shall be free from controversial matter of opinion or policy.

\* \* \* \* \*

"8. It is agreed between the parties that the price of the magazine supplements to be furnished by the Weekly is based upon the following:

"(a) A twenty-four (24) page supplement carrying approximately fifty-four (54) columns of advertising.

"(b) Cost of:

Newsprint, $42.50 per ton;

Standard Red Ink, .29 3/4 per lb.,
Standard Blue Ink, .23¼ per lb.,
Standard Yellow Ink, .18¼ per lb.,
Standard Black Ink, .065 per lb.

Labor costs based on the union scales in effect in Chicago June 1, 1937.

"(c) The price of the magazine supplement will be increased or decreased by the Weekly as the costs of any of these items increase or decrease.

"(d) The price of the magazine supplements will increase or decrease in units of two pages on basis of costs stated under (b) and (c) at the rate of $1.015 per thousand each two pages increase or decrease above or below twenty-four (24) pages.

"(e) In the event that the Weekly should find it necessary to make delivery of the magazine supplements f. o. b. printing plants other than at Chicago, the price above mentioned would be adjusted to meet the following additions or deductions:

"Local labor scales; additional freight charges on ink; cost of transporting newsprint from common carrier to plant.

the Weekly is based upon the following: (a) A 24 page supplement carrying approximately 54 columns of advertising." Now twenty-four pages are 168 columns. There must (Par. 3) be a minimum of 84 columns editorial matter. We here are told that of the remaining 84 columns approximately 54 will be advertising, the other 30 columns being filled with additional editorial matter as needed. A ratio of 54 columns advertising to 168 editorial matter, or 32% to 68%, is thus indicated. But this Paragraph is not a description of the supplement which must be fulfilled by each issue to render the issue tenderable, like the minimum of 84 columns of editorial matter is. Paragraph 8 is concerned with *the price,* and its variation from $13.05 per thousand because of the five variable elements it lists. One variable is the size, 24 pages, which may be varied in multiples of 2 pages, each 2 pages causing a change of $1.015 per thousand. Other variables are the cost of paper, ink and labor. The *quantity* of advertising is here mentioned for the first and only time. It is mentioned as a *basis of price,* and evidently is to *affect* the price along with the other things set forth in Par. 8. Thus a departure from the advertising ratio is not made a ground for rejecting an issue, as not filling the description of the thing to be delivered, but, as it enters into the basis of the price, it may affect the price. But the contract does not say *how much* it shall affect it. Nevertheless there would arise a partial failure of consideration which the court can adjust, measured by the pecuniary loss occasioned by the failure. Still a failure to secure the exact ratio of advertising is not to count, because of the use of the word "approximately". That word means "about", "in the neighborhood of". If the variation, averaged over the period considered, is substantial, causing Houston an unreasonable loss in the advertising income due it under the contract, Houston may recoup the loss. Excess of the ratio in issues where the ratio was exceeded will also be considered in making the average.[2] As in all problems of damages, where no exact measure is provided, there is room for judgment and estimate by the fact finder.

We think the mention of "approximately 54 columns of advertising" in the cost basis

adjustment cannot be ignored as appellee contends. The words were intended to have an effect. The income from advertising was expected by the parties, in their negotiation, to reduce greatly the cost of the supplement to Houston. American pointed out Par. 8 to Houston as its protection against too little advertising. The parties differ as to what was then said, and as to what the just quoted words mean. We believe we have given them their just effect.

 We therefore conclude that since every issue of the supplement contained the minimum of 84 columns of editorial matter and some advertising, as required by Par. 3, no issue of the supplement could be altogether rejected, and none was. Since the papers were to be delivered to Houston f. o. b. Chicago, Houston can charge no freight to American. Houston is entitled to its part of advertising income collected on all issues. Houston is entitled to a fair abatement of price each year for a failure to carry approximately the proportion of advertising named in the price basis of the contract, the amount to be fixed by the trial court. The judgment is accordingly reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Rehearing denied; HUTCHESON, Circuit Judge dissenting. See 135 F.2d 733.

---

[2] Mr. Maes, who contracted for Houston, testifies: "It was not my understanding that the ratio was to be maintained in every issue, because there are times during a year when it could not be met, but it is supposed to apply over a certain period, a year, or whatever you want to make it."